UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Debbie Dupont,

     Plaintiff,

v.

Allina Health System,

     Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 12-2126 (MJD/SER)

_____

     Brian T. Rochel and Michelle Dye Neumann, Schaefer Law Firm, LLC, Counsel for Plaintiff.

     Tina A. Syring-Petrocchi and Amy C. Taber, Barnes & Thornburg LLP, Counsel for Defendant.

_____

     This matter is before the Court on Defendant Allina Health System's

("Allina") motion for summary judgment.

## I.    Factual Background

     Plaintiff was employed by Allina at the St. Francis Regional Medical Center

from 1976 to July 2012 as an Environmental Services Aide ("ESA") and was a

member of the Service Employees International Union ("SEIU").  ESAs are

responsible for cleaning specific areas of the hospital assigned to them.  Plaintiff

worked on the day shift and was responsible for cleaning occupied patient

1

rooms, discharge rooms and common areas, including waiting rooms, hallways and restrooms.

Plaintiff is 53 years old and was born with hearing and visual impairments and a heart murmur.  She is deaf in her left ear and wears a hearing aid in her right ear.  She is blind in her right eye, has limited vision in her left eye, and occasionally wears corrective lenses.  Her visual impairment impacts her peripheral vision, but she drives a car - except at night and on highways - reads and watches television.  Finally, Plaintiff's heart murmur causes her to be weaker than those without a heart murmur, but she is on medication for that ailment.

Plaintiff asserts that the combination of her disabilities creates issues with her development, comprehension and communication.  (Gene Dep. at 111-12; Miller Aff. ¶¶ 5-7; Wangen Aff ¶¶ 11-13; Finley Aff. ¶ 3; Ex. 58.)  Other employees report difficulty communicating with Plaintiff.  (Ex. 30 at DD000363; Miller Aff. ¶ 5; Wangen Aff ¶ 11.)

In the spring of 2011, Allina put in place a system-wide standardized cleaning process.  This process includes uniform productivity and performance cleaning standards ("cleaning standards").  (Harris Dep. at 17-18, 30, 33.)  The cleaning standards were established based on surveys of its Environmental

2

Services Department and a detailed analysis of square footage cleaned, cleaning times and the essential functions of the ESAs.  (Id. at 18.)   Allina disseminated an Environmental Services Cleaning Guidebook, and scheduled training sessions, to educate staff as to the cleaning standards.  (Anderson Dep. at 22, 26; Harris Dep. at 33; Ex. L).)  ESAs at St. Francis Regional Medical Center attended training on two days in May 2011.  With the implementation of these cleaning standards, Allina asserts that a discharge room[1] should generally be cleaned in 30 to 45 minutes, depending on the room size and the equipment in the room.  (Exs. M and LL; Harris Dep. at 56; Anderson Dep. at 26.)  An occupied patient room, however, should be cleaned in approximately fifteen minutes.  (Ex. M.)

Allina asserts that even before the cleaning standards were implemented, management had concerns about the time in which it took to clean assigned rooms.  (Harris Dep. at 16; Nystrom Dep. at 22; Krueger Dep. at 16-17.)  On occasion, she did not complete all of her assigned tasks during her shift, and her co-workers complained that Plaintiff's slowness resulted in them completing some of Plaintiff's tasks or that rooms would not be ready when needed.

---

[1]An occupied patient room becomes a discharge room upon a patient's release and is to be cleaned immediately for a new patient.

(Krueger Dep. at 19-20, 23; Harris Dep. at 33.)  While her co-workers did help her complete her tasks in the past, such assistance allegedly became more burdensome when staffing at the hospital was dropped.  (Harris Dep. at 34-35, 41.)  To address this issue, Allina met with Plaintiff on multiple occasions to discuss ways for Plaintiff to complete her tasks timely, and provided Plaintiff with one-on-one training and shadowing opportunities.  (Exs. U, V and W.)

Around 2010, Allina assigned Plaintiff to clean only common areas. (Plaintiff Dep. at 32; Krueger Dep. at 42-43.)  Her supervisor at the time, Nancy Krueger, testified that Plaintiff was not able to complete her cleaning assignments by the end of her shift, and that after cleaning common areas for four to six months, Plaintiff asked that she be assigned to cleaning rooms in the pediatrics area.  (Krueger Dep. at 42-45.)  Plaintiff believes that her supervisor, Krueger, was being mean to her, and that Krueger made the decision for Plaintiff to resume cleaning patient rooms.  (Plaintiff Dep. at 33, 35.)  Plaintiff's brother witnessed Krueger talk loudly to Plaintiff and that Krueger appeared to lose her patience with and talk down to Plaintiff.  (Gene Dep. at 36-37.)

Once the cleaning standards were implemented in 2011, and Plaintiff failed to meet them, Allina issued Plaintiff a Level 1 corrective action on May 18, 2011

4

and was provided additional coaching.  (Ex. X.)  Plaintiff continued to take too

much time to complete her cleaning tasks and as a result, Allina again met with

Plaintiff on July 26, 2011 to discuss her failure to meet the cleaning standards and

issued her a Level 2 corrective action.  (Exs. Z and AA.)

Another meeting was held on August 9, 2011 concerning Plaintiff's work

performance.  (Ex. BB.)  At this meeting was Plaintiff's manager, Jimly Harris, her

supervisor, Nancy Krueger, human resource specialist Anita Nystrom, and

Plaintiff's brother and his wife, Gene and Sue DuPont.  (Id.)  During this meeting,

it was agreed that Becky Lucius, ESA lead, would provide additional training to

Plaintiff.  (Id.)  At a follow-up meeting on September 15, 2011, Allina offered

Plaintiff a transfer to an evening ESA position in a different area of St. Francis

Regional Medical Center that had no patient care rooms and therefore no

cleaning standards to comply with.  (Nystrom Dep. at 40.)  Plaintiff declined the

position, stating she did not see well at night and therefore was not comfortable

driving home at night and because there were car break-ins in the parking lot.

(Plaintiff Dep. at 60-61.)

On September 18, 2011, Plaintiff submitted a job accommodation request

form requesting additional time to do her job in an efficient manner.  (Ex. E.)  In

response, Allina requested additional medical information and arranged for Plaintiff to complete a fitness for duty examination.  (Ex. GG.)  Allina continued working with Plaintiff to improve her turnaround time and to retrain her pending the results of the medical evaluation. (Harris Dep. at 37-38.)

On January 25, 2012, Allina received the results from Plaintiff's medical assessment.  (Ex. HH.)  The assessment provided Plaintiff was not able to provide a clear answer as to why her medical conditions prevented her from completing her job duties in a timely fashion.  (Id.)  The assessment further recommended that based on the totality of her medical history, "it seems reasonable that she may need some additional time to perform tasks."  (Id.)

Allina thereafter met with Plaintiff to discuss her fitness assessment. Plaintiff informed Allina that she wanted between 75 minutes and 90 minutes to clean a discharge room, 120 minutes to clean an isolation room and 15 minutes to clean an occupied room.  (Ex. II.)  Allina responded that allowing more time to complete her work required lowering the uniformly-applied cleaning standards, which was not a reasonable accommodation.  (Ex. FF.)  Allina further explained that it was not a reasonable accommodation to pull other employees away from their unfinished work to help her complete her cleaning.  (Harris Dep. at 39-40.)

On February 9, 2012, Allina placed Plaintiff on a medical leave of absence. (Ex. JJ.) She was directed to contact the service center to request a medical leave of absence, and to follow the instructions of the leave specialist. (Id.) Allina further instructed Plaintiff that if additional accommodations were identified, such accommodations would be discussed with Plaintiff. (Id.)

The next day, Plaintiff's brother Gene emailed Allina, on behalf of Plaintiff, stating that Plaintiff would return to work on February 15, 2012. (Ex. MM.) Allina responded that Plaintiff could return to work, but that she would be held to the cleaning standards, with or without accommodation. (Ex. OO.) Allina also informed Plaintiff that it was open to continued discussions and ideas related to reasonable accommodations that would allow her to do the essential functions of her job. (Id.) Sometime after the February 9, 2012 meeting, Gene and Sue Dupont met with Nystrom to discuss Plaintiff. (Gene Dep. at 79.) Gene asked Nystrom why, after almost 36 years, did Allina decide that Plaintiff could no longer do her job. Nystrom allegedly replied "I don't know why. I think she's probably older now." (Id.)

At some time, Allina discussed the accommodation of allowing Plaintiff to only clean offices. This accommodation was ultimately not offered because staff

that clean offices are required to carry a radio, and in an emergency, they would be called away from cleaning offices or common areas to clean discharge rooms. (Nystrom Dep. at 45-46.)  Plaintiff was not able to operate a radio, however, given her hearing impairment.  (Id. at 43-44.)

Plaintiff returned to work on February 15, 2012.  Allina claims that Plaintiff continued to fail to meet the cleaning standards and another Level 1 corrective action was issued.  (Ex. P P.)  At a meeting held on February 22, 2012, the participants discussed Plaintiff's failure to meet the cleaning standards, along with other performance issues.  (Id.; Ex. QQ.)  They also discussed a plan in which union steward Michelle Finley would shadow Plaintiff while cleaning a room and to provide Plaintiff a new timer.  (Id.; Harris at 44-45.)

Between February 22 and March 7, 2012, Allina observed that Plaintiff needed help from co-workers every day to timely clean the discharge rooms assigned to her.  (Ex. RR.)  When she was shadowed by Finley cleaning a discharge room on February 27, 2012, it took her 80 minutes.  (Ex. S S.)  Finley noted that Plaintiff seemed to be over-cleaning the rooms, and asked for a list of items to be cleaned.  (Id.)  Finley agreed to shadow an ESA lead in order to provide clarity as to what Plaintiff is required to clean.  (Id.)

8

On March 5, 2012, an independent person, Amanda Whaley, audited Plaintiff and observed her clean a discharge room in one hour.  (Ex. TT.)  Whaley also noticed that Plaintiff was over-cleaning surfaces.  (Id.)

Allina issued a Level 2 corrective action on March 7, 2012.  (Ex. RR.) Plaintiff signed the corrective action, but noted on the form that she believed she was being discriminated against based on her disabilities.  (Id.)  This corrective action included an action plan to continue working with the union to identify a reasonable accommodation.  (Id.)

Plaintiff submitted another accommodation request on March 14, 2012, asking that she not be required to clean discharge rooms.  (Ex. F.)  Allina met with Plaintiff on March 21, 2012 to discuss this request.  (Ex. WW.)  Allina explained that if it were to grant her request, other staff would have to be reassigned duties.  (Id.)  Allina also explained to Plaintiff that based on previous accommodation requests, other staff were already being pulled from their duties to assist Plaintiff with curtain replacement.  (Id.)  Allina offered Plaintiff an evening shift position that did not require her to clean patient rooms.  (Id.) Plaintiff rejected this offer, due to safety concerns she had about driving at night and arriving home in the dark.  (Id.)

Another meeting was held on April 5, 2012 at which Plaintiff was again offered reassignment to the evening position. (Ex. XX.) Plaintiff again declined, citing safety concerns. (Ex. YY.)

Allina asserts that despite all of the coaching, Plaintiff's productivity did not improve and a Level 3 corrective action was issued to Plaintiff on May 4, 2012. (Ex. AAA.) This corrective action set forth details and observations regarding Plaintiff's performance on April 13, 15 and 30 and May 4, 2012, noting that her sub-standard performance impacted negatively on teamwork, patient care and patient satisfaction. (Id.) Plaintiff refused to sign the corrective action, and again noted that she believed she was being discriminated against based on her disability. (Id.) Plaintiff then filed a grievance that same day, claiming that Jimly Harris threatened her at the meeting. (Ex. BBB.)

On May 10, 2012, Allina again met with Plaintiff to develop action steps designed to meet the corrective action goals set forth in the Level 3 corrective action. (Ex. DDD.) That same day, Plaintiff submitted two more accommodation requests. (Ex. G.) One request provided "for any and all training involving my job I need one-on-one training and instruction, with a union steward present." (Id.) The other request stated "Notify and invite my power of attorney to any

and all meetings, communications, correspondence, etc., with a 24 hour notice prior to all of the above." (Id.)  Plaintiff's power of attorney ("POA") is her brother Gene.  In the capacity of POA, Gene can act on behalf of Plaintiff with respect to certain matters, which does not include employment-related meetings. (Ex. FFF.)

Allina met with Plaintiff on June 7, 2012 to discuss her latest accommodation requests.  (Ex. GGG.)  Allina also provided Plaintiff a written response to her requests.  (Ex. HHH.)  The parties agreed that when feasible and for a planned meeting, Gene would be allowed to attend meetings on Plaintiff's behalf.  (Id.; Gene Dep. at 91-93.)  With respect to Plaintiff's request for one-on-one training with a union steward present, the parties agreed that Plaintiff would ensure she was in the front of the room during classroom training, Plaintiff would notify Adam or Jimly if she needed additional help or training, and Plaintiff would review the written department/touchdown minutes and a weekly update for further clarification.  (Ex. HHH.)  Allina would not agree to her request for a union steward to be present during one-on-one training.  (Id.)

Allina met with Plaintiff on June 18, 2012 to discuss her performance over the previous week.  (Ex. III.)  At this meeting, a number of work issues were

discussed with Plaintiff, including the fact that she did not complete any

discharge room on her own, and the fact that she continued to take excessive time

to clean a room.  (Id.)  Allina informed Plaintiff that it intended to proceed to the

next corrective action step because of her continued failure to meet the cleaning

standards.

A meeting was held on June 20, 2012 regarding this corrective action. (Ex.

KKK.)  Plaintiff refused to sign this corrective action, and instead wrote that "I

am being discriminated against based on my disabilities."  (Id.)  Plaintiff also

filed a grievance, requesting the corrective action be removed from her file.  (Ex.

LLL.)

On June 25, 2012, the parties again met to create action steps designed to

meet the June 20, 2012 corrective action goals.  They discussed using discharge

cards on the floor, Plaintiff's renewed refusal to transfer to an evening shift, the

union's position that Plaintiff be allowed to do more occupied rooms and

assigning her discharge rooms to other ESAs, the need for Plaintiff to work faster,

and tracking Plaintiff's time cleaning a discharge room.  (Ex. NNN.)   Action

Steps were put into place that provided Plaintiff would write down the time she

started and ended a task; that she would be given a discharge card by a nurse to

let her know to stop cleaning a common area and to begin cleaning the discharge room and that Jimly Harris would compile data to determine tasks to cut, eliminate or to improve.  (Id.; Ex. KKK.)

On July 18, 2012, another meeting was held to discuss Plaintiff's performance and accommodation requests.  (Ex. QQQ.)  The next day, the parties met to review Plaintiff's performance over the previous week.  Allina informed Plaintiff that her work was sub-standard, and noted that she continued to take 1 ½ to 2 hours to clean a discharge room and 1 ½ hours to clean the common area. (Ex. RRR.)   Based on this review, and the ongoing attempts to accommodate Plaintiff, Allina decided to terminate Plaintiff's employment.  (Id.)

This action was commenced in August 2012.  In her Complaint, Plaintiff has asserted claims of disability discrimination, failure to accommodate and retaliation under the Americans with Disabilities Act ("ADA") and the Minnesota Human Rights Act ("MHRA") and a claim of age discrimination under the MHRA.

## II.    Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material

13

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

## III.    Discussion

### A.    Disability Discrimination

The elements of a prima facie case of disability discrimination are: 1)

Plaintiff is disabled as defined by the ADA; 2) she is qualified to perform the

essential functions of the job, with or without reasonable accommodation; and 3)

she has suffered an adverse employment action due to her disability.  Pittari v.

American Eagle Airlines, Inc., 468 F.3d 1056, 1061 (8th Cir. 2006)[2].  Allina does

not dispute that Plaintiff is disabled within the meaning of the law.

_____

[2]Claims asserted under the ADA and the MHRA are evaluated under the same
standards.  Phillip v. Ford Motor Co., 328 F.3d 1020, 1023 n. 3 (8th Cir. 2003).

### 1.     Qualified to Perform Essential Job Functions

The parties dispute whether Plaintiff is qualified to perform the essential

functions of the ESA position, with or without a reasonable accommodation.

Allina asserts that cleaning discharge rooms, within the time frame set forth in

the cleaning standards, is an essential function of the ESA position.  As Plaintiff

cannot clean a discharge room within that time frame, despite additional

training, shadowing and the use of timers, she cannot demonstrate that she is

qualified to perform the essential functions of the ESA position with or without

accommodation.

The essential functions are those considered the fundamental duties of the

job.  Rehrs v. Iams Co., 486 F.3d 353, 356 (8th Cir. 2007).  "[T]he employer's

judgment in this regard is considered 'highly probative.'"  Duello v. Buchanan

County Bd. of Supervisors, 628 F.3d 968, 972 (8th Cir. 2010) (quoting Kammueller

v. Loomis, Fargo & Co., 383 F.3d 779, 786 (8th Cir. 2003)).  The burden is on the

employer to show a particular job function is essential.  Rehrs, 486 F.3d at 356.

> Evidence of whether a particular function is essential includes, but is not
> limited to, (1) the employer's judgment as to which functions are essential;
> (2) written job descriptions prepared before advertising or interviewing
> applicants for the job; (3) the amount of time spent on the job performing
> the function; (4) the consequences of not requiring the incumbent to

perform the function; (5) the terms of a collective bargaining agreement; (6) the work experience of past incumbents in the job; and (7) the current work experience of incumbents in similar jobs.

Id.

As noted above, Allina considers it an essential function of the ESA position to clean assigned hospital rooms pursuant to the cleaning standards adopted in 2011, which includes cleaning discharge rooms in 30 to 45 minutes. The written job description provides that one of the major responsibilities of the ESA job is using "proper procedures" in the assigned area, which is measured by "Patient room cleaning schedule and order of cleaning being followed." (Ex. O.) While the written description does not specifically list the time in which a particular room must be cleaned, there is evidence in the record to support Allina's assertion that cleaning discharge rooms is routine for ESAs, and that the cleaning standards generally require discharge rooms to be cleaned in 30 to 45 minutes, subject to variables, including, but not limited to, the amount of equipment in a particular room, or whether the room was an isolation room. (Anderson Dep. at 26-27.)

Allina further argues that while the cleaning standards as applied in this case may tend to screen out individuals with a disability, such a standard is not

16

unlawful if "the standard, test or other selection criteria, as used by the [employer], is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).  Allina asserts that the cleaning standards are not unlawful as they were put in place to increase patient satisfaction, by ensuring that patients would not have to wait too long for a room to be made available.  See Milton v. Scrivner, Inc., 53 F.3d 1118, 1124-25 (10th Cir. 1995) (finding that altering or reducing production cleaning standards is more accommodation than is reasonable, when cleaning standards were implemented to increase business profits).

Viewing the facts in the light most favorable to Plaintiff, however, the Court finds that there are genuine issues of material fact as to whether cleaning discharge rooms in 30 to 45 minutes is an essential function of the ESA position, or whether the cleaning standards unlawfully screen out disabled persons.

The record demonstrates that Plaintiff was employed as an ESA for Allina for thirty-five years, and until the cleaning standards were adopted, she was considered to be a valuable employee.  (Krueger Dep. at 16 (testifying that Plaintiff provided high quality work).)  It also appears that Plaintiff's performance began to receive scrutiny in 2008 by her supervisor, Nancy Krueger.

17

It is Plaintiff's position that Krueger did not like Plaintiff, and was mean to her; an assertion that is supported by Plaintiff's brother Gene.  The record also shows that when the cleaning standards were adopted in 2011, nothing about the ESA job changed, other than the implementation of time guidelines. (See Nystrom Dep. at 53.)  There is also no dispute that prior to the implementation of the cleaning standards, Plaintiff's co-workers routinely helped her complete her assignments, and that at one time, Plaintiff was allowed to clean only common areas.  The record also shows that the cleaning standards are not black and white - that the time to clean a room will depend on the room, whether it is an isolation room and the equipment in the room.  In fact, Anita Nystrom, Allina's human resource specialist, testified that the ESA position requires flexibility, as daily assignments are set depending on patient volumes, leaves of absences, vacations or special projects.  (Id. at 19-20.)  Taken together, these facts demonstrate the existence of genuine issues of material fact as to whether the essential functions of the ESA position include cleaning a discharge room within a certain time frame, and if so, whether Plaintiff could complete such function with reasonable accommodation.

2.    **Causation**

Allina also argues that Plaintiff cannot demonstrate that she suffered an adverse employment action because of her disability.  The fact that Plaintiff is disabled does not mean she is immune from employee discipline.  See Hervey v. Cty of Koochiching, 527 F.3d 711, 723 (8th Cir. 2008) (finding that "[i]nsubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action.")   Employers are allowed to use the same evaluation criteria to determine an employee's productivity, regardless of whether the employee has a disability.  App. to 29 CFR § 1630.2(n).

To prove her disability claim, Plaintiff need only show that Allina was motivated by her disabilities in terminating her employment.  Belk v. Sw. Bell Tel. Co., 194 F.3d 946, 950 (8th Cir. 1999).  Viewing the facts in the light most favorable to Plaintiff, the Court finds there are genuine issues of material fact as to whether the decision to terminate Plaintiff's employment was motivated by Plaintiff's disability.

There is no dispute that she was fired because she could not clean patient rooms fast enough.  There is also no dispute that Plaintiff is a disabled person,

and that a medical professional recommended that based on "the totality of her medical history" she be allowed extra time to complete her tasks.  There is also evidence that around this time, Plaintiff's supervisor began to frequently document Plaintiff's work performance, specifically the time with which she completed her tasks.  In addition, there is some evidence in the record that other ESAs may have been treated differently.  For example, union steward Michelle Finley asserts that another ESA was observed taking longer than 30 to 45 minutes to clean a discharge room and that such ESA was not issued a corrective action. (Finley Aff. ¶ 11; Allina's Answers to Pl.'s Interros. Nos. 8-10) (list of ESAs that received corrective action from 2010 through December 2012).)  ESA manager, Jimly Harris, testified that she believed that Plaintiff could meet cleaning standards if she chose to, but that she believed that Plaintiff chose not to.  (Harris Dep. at 67; Ex. 34).)  Further, in an email to a supervisor, Harris wrote that she would "love to document [Plaintiff] falsifying information" and that "I honestly feel that [Plaintiff] takes advantage of being super slow - and not desiring to contribute to the team."  (Ex. 34.)  In addition, as Plaintiff points out, the cleaning standards are unwritten, and Allina did not adopt a policy or procedure for uniform use in enforcing the cleaning standards.

### 3.    Legitimate Business Reason for Discharge/Pretext

Allina has asserted a legitimate business reason for its decision to

terminate Plaintiff's employment - inability to meet cleaning standards for

cleaning patient rooms in a timely fashion.

To demonstrate pretext, Plaintiff must present evidence that demonstrates

both that the employer's articulated reason for the adverse employment action

was false and that discrimination was the real reason.  Wilking v. Cty of Ramsey,

153 F.3d 869, 874 (8th Cir. 1998) (citing Roxas v. Presentation College, 90 F.3d 310,

316 (8th Cir. 1996) (finding that a plaintiff "must demonstrate that a

discriminatory animus lies behind the defendant's neutral explanations.")

As set forth above, there are fact questions as to whether cleaning

discharge rooms pursuant to the newly implemented cleaning standards was an

essential function of the ESA job, and whether the decision to terminate Plaintiff's

employment was motivated by Plaintiff's disability.  If a jury finds that cleaning

discharge rooms within 30 to 45 minutes is not an essential function of the ESA

position, the jury could find that Allina's articulated reason for Plaintiff's

termination is a pretext for discrimination.  Accordingly, the Court finds that

Allina has not demonstrated that it is entitled to summary judgment as to

Plaintiff's claims of disability discrimination.

### B.      Failure to Accommodate

Plaintiff alleges that Allina failed to accommodate her disabilities in violation of the ADA and the MHRA.  To succeed on her claim of failure to accommodate, Plaintiff must prove that she was disabled and that she was a qualified individual.  Fenney v. Dakota, MN & Eastern R. Co., 327 F.3d 707, 712 (8th Cir. 2003).  If Plaintiff cannot perform the essential functions of the ESA job without accommodation, she must show that an accommodation is possible. Fenney, 327 F.3d at 712.  Once this showing is made, the burden shifts to the employer to show that it was unable to accommodate the employee.  Id.  An employer is not required to provide an accommodation that it can demonstrate would impose an undue hardship on its operation.  42 U.S.C. § 12112(b)(5)(A). The law also provides that where an employee requests an accommodation, the employer must, in good faith, engage in an interactive process to determine whether a reasonable accommodation is possible.  Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1021 (8th Cir. 2000).

A reasonable accommodation can include job restructuring, part-time or modified work schedules, reassignment to a vacant position, an appropriate

adjustment or modification of examinations or training or other similar

accommodations. 42 U.S.C. § 12111(9)(B); Minn. Stat. § 363A.08, subd. 6.

Allina argues that Plaintiff's failure to accommodate claim fails as no

reasonable accommodation exists which would allow Plaintiff to complete the

essential functions of the ESA position.  The accommodations Plaintiff requested

- not to clean discharge rooms or to have more time to clean the discharge rooms

- are not reasonable as a matter of law because they would either require Allina

to reassign workers or to create a new position.  Alexander v. Northland Inn, 321

F.3d 723, 727-28 (8th Cir. 2003) (employer not required to reassign employees to

assist a disabled plaintiff); Cravens, 214 F.3d at 1019 (finding employer not

required to create a new position); Milton, 53 F.3d at 1125 (employer not required

to lower performance standards); App. to 29 CFR § 1630.2(n).

The Court finds that whether a reasonable accommodation exists in this

case is a question for the jury.  Plaintiff has demonstrated that she successfully

performed the duties of an ESA at St. Francis Regional Medical Center for over

thirty years, and that in the past, she had been given the accommodation of

cleaning only common areas or extra time to clean rooms.  As she had been so

accommodated in the past, a jury may find that her requests for similar

accommodations in 2011 were reasonable, and did not impose an undue

hardship on Allina.  Summary judgment on this claim is therefore not warranted.

### C.    Retaliation

As noted above, Plaintiff has asserted that she suffered retaliation for

engaging in protected activity under the ADA and the MHRA.  To establish a

prima facie case of retaliation, Plaintiff must show: she engaged in statutorily

protected conduct; a reasonable person would have perceived the alleged

retaliatory action to be materially adverse; and a causal connection exists between

participation in the protected activity and the adverse employment action.

Sutherland v. Mo. Dep't of Corr., 580 F.3d 748, 752 (8th Cir. 2009).  If Plaintiff

establishes a prima facie case of retaliation, the burden then shifts to Allina to

produce a legitimate, non-retaliatory reason for its employment actions.  If Allina

meets its burden, then Plaintiff must prove that Allina's reasons are a pretext for

discrimination.  Clegg v. Arkansas Dep't of Corr., 496 F.3d 922, 928 (8th Cir. 2007)

(noting that the McDonnell Douglas framework was to be used to analyze the

plaintiff's retaliation claim).  To prove pretext, Plaintiff must both discredit

Allina's asserted reasons for its employment actions and show the circumstances

permit drawing a reasonable inference that the real reason for the employment

decisions was retaliation.  Gilbert v. Des Moines Area Comm. Coll., 495 F.3d 906,

918 (8th Cir. 2007).

Allina does not dispute that Plaintiff engaged in protected conduct or that

she suffered an adverse employment action.  Allina does argue, however, that

Plaintiff cannot show a causal connection between the protected conduct and her

termination.  "Evidence that the employer had been concerned about a problem

before the employee engaged in protected activity undercuts the significance of

the temporal proximity."  Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th

Cir. 2002).

Plaintiff has put forth sufficient evidence to raise fact questions as to her

claim that she was terminated in retaliation for engaging in protected conduct.

She has demonstrated that in 2010, her supervisor began to monitor her work.

Thereafter, on the same day the cleaning standards were implemented, Plaintiff

received the first corrective action.  She immediately complained[3] that she was

being discriminated against, and in response, Allina continued to issue corrective

actions, and ultimately terminated her employment.  Summary judgment on the

_____

[3]It is no matter that the first person to raise the issue of disability discrimination was
Plaintiff's brother Gene, not Plaintiff, given the fact that Gene had been Plaintiff's advocate with
regard to her employment for years.

retaliation claim is thus not warranted.

### D. Age Discrimination

The Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08, subd. 2(2)(3), prohibits discrimination in employment on the basis of age. Claims arising under the MHRA are considered under the same analysis as claims arising under federal law. Chambers v. Metropolitan Prop. and Cas. Ins. Co., 351 F.3d 848, 855 (8th Cir. 2003).

A claim of age discrimination may be proved by direct or circumstantial evidence. Id. Where there is a lack of direct evidence of discrimination, Plaintiff can prove her claim under the McDonnell Douglas burden shifting analysis.

Here, Plaintiff asserts there is direct evidence of age discrimination, as demonstrated by Nystrom's response to Gene's question of why Allina had decided that Plaintiff could no longer complete the duties of an ESA - "I don't know why. I think she's probably older now." (Gene Dep. at 79.)

Allina responds that a single ageist comment is not enough to establish age animus. See, e.g., Smith v. DataCard Corp., 9 F. Supp.2d 1067, 1079 (D. Minn. 1998) (finding stray remarks unrelated to decisional process not sufficient to establish a prima facie case). In addition, Allina asserts the comment was made

five months before Plaintiff's termination, and simply reflects a truthful, neutral

statement.  The Court disagrees, and finds a jury could find that Allina believed

she could no longer complete the duties of an ESA because of her age.  Summary

judgment on this claim must therefore be denied.

**IT IS HEREBY ORDERED** that Allina Health System's Motion for

Summary Judgment [Doc. No. 12] is **DENIED**.

Date:   January 28, 2014


s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court